**No. 25-6377**

United States Court of Appeals
for the Ninth Circuit

**SAMUEL VICKERY; RAE FULLER, individually and on behalf of all
others similarly situated,**

*Plaintiffs-Appellees,*

v.

**EMPOWER FINANCE, INC.,**

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
NO. 3:25-CV-03675-JSC
HON. JACQUELINE S. CORLEY

**APPELLEES' RESPONSE BRIEF**

Randall K. Pulliam
Lee Lowther
CARNEY BATES & PULLIAM,
PLLC
One Allied Drive, Suite 1400
Little Rock, Arkansas 72202
(501) 312-8500
rpulliam@cbplaw.com
llowther@cbplaw.com

Joshua Jacobson
Jacob L. Phillips
JACOBSON PHILLIPS PLLC
2277 Lee Road, Suite B
Winter Park, Florida 32789
(321) 447-6461
joshua@jacobsonphillips.com
jacob@jacobsonphillips.com

*Counsel for Plaintiffs-Appellees*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. iii

INTRODUCTION ............................................................................. 1

JURISDICTIONAL STATEMENT ...................................................... 3

ISSUES PRESENTED ....................................................................... 4

STATEMENT OF THE CASE ............................................................. 5

    I.    Factual Background .................................................................. 5

        A. Empower extends Cash Advances only to borrowers it deems creditworthy following its rigorous underwriting process. ......... 6

        B. Empower conditions its Cash Advances on borrowers' agreement to repay an amount due on a specific repayment date, enforced through mandatory pre-authorized repayment debits. ...................................................................................... 7

        C. Empower imposes charges on borrowers to whom it extends Cash Advances. ............................................................................ 10

    II.    Statutory and Regulatory Background ..................................... 13

    III.    Procedural Background ........................................................... 15

    IV.    The Order on Review ............................................................. 17

SUMMARY OF ARGUMENT ............................................................. 23

STANDARD OF REVIEW ................................................................. 25

ARGUMENT .................................................................................. 25

    I.    The MLA Displaces the FAA and Prohibits Enforcement of Arbitration Agreements as to Disputes Involving Consumer Credit . 26

    II.    The Parties' Dispute Involves the Extension of Consumer Credit under the MLA ............................................................. 27

        A. Plaintiffs plead facts, confirmed by Empower's terms, that demonstrate Cash Advances are "credit." ............................... 28

i. All relevant sources of ordinary meaning demonstrate that Empower Cash Advances constitute "credit." .....................29

ii. The "non-recourse" provision in the Cash Advance terms does not preclude credit treatment. ...................................38

iii. Empower erroneously contends that its choice to waive judicial remedies means its borrowers never had an obligation to repay a Cash Advance in the first place. ......43

iv. Empower's other credit arguments miss the mark............46

v. The CFPB's new Advisory Opinion is irrelevant but, if anything, confirms Cash Advances are credit....................49

vi. Empower invokes irrelevant state laws. ...........................54

B. Plaintiffs' allegations and the undisputed material facts demonstrate that Empower's Instant Transfer Fees constitute "finance charges" under the MLA. ...........................................55

i. Instant Delivery Fees are Incident to the Extension of Empower Cash Advances ...................................................56

ii. Empower imposes fees to unlock the Instant feature of its Cash Advances. ................................................................59

iii. Empower's citations to distinguishable and non-binding regulatory guidance and caselaw do not support its argument that Instant Delivery Fees are not finance charges.............................................................................62

CONCLUSION ..................................................................................67

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. Carrington Mortg. Servs., LLC,*
23 F.4th 370 (4th Cir. 2022) ............................................................. 58

*Azure v. Morton,*
514 F.2d 897 (9th Cir. 1975) ........................................................... 61

*Burnett v. Ala. Moana Pawn Shop,*
3 F.3d 1261 (9th Cir. 1993) ............................................................. 41

*Burrison v. FloatMe, Corp.,*
No. 25-cv-10885-DJC, 2026 WL 444638 (D. Mass. Feb. 17, 2026) . 17, 37, 56

*Capela v. J.G. Wentworth,*
No. CV09-882 (SJF) (WDW), 2009 WL 3128003 (E.D.N.Y. Sept. 24, 2009) ....................................................................................... 53

*Caremark, LLC v. Chickasaw Nation,*
43 F.4th 1021 (9th Cir. 2022) .......................................................... 26

*CFPB v. Snap Fin. LLC,*
No. 2:23-cv-00462, 2024 WL 3625007 (D. Utah Aug. 1, 2024) ........ 53

*E.C. Warner Co. v. W. B. Foshay Co.,*
57 F.2d 656 (8th Cir. 1932) ....................................................... 12, 42

*E.E. v. Norris Sch. Dist.,*
4 F.4th 866 (9th Cir. 2021) ............................................................. 40

*FCC v. AT&T Inc.*,
    562 U.S. 397 (2011)...................................................................29

*Feeman v. Bridge IT, Inc.*,
    No. 25-cv-3806 (LJL), 2026 WL 880508 (S.D.N.Y. Mar. 30, 2026)..18

*Foster v. EquityKey Real Estate Invs. L.P.*,
    No. 17-cv-00067-HRL, 2017 U.S. Dist. LEXIS 70958 (N.D. Cal. May
    9, 2017) ...................................................................................53

*Glover v. Ocwen Loan Servicing, LLC*,
    127 F.4th 1278 (11th Cir. 2025).....................................................59

*Golubiewski v. Activehours, Inc.*,
    No. 1:24-cv-02283-JRR, 2025 WL 2484192 (M.D. Pa. Aug. 28, 2025)
    .....................................................................................17, 22, 56

*Holley-Gallegly v. TA Operating, LLC*,
    74 F.4th 997 (9th Cir. 2023) ..........................................................25

*Household Credit Servs. v. Pfennig*,
    541 U.S. 232 (2004)..........................................................21, 56, 64

*In re Miller*,
    215 B.R. 970 (E.D. Ky. Bkr. 1997) .................................................43

*Johnson v. Activehours, Inc.*,
    No. 1:24-cv-2283, 2025 WL 2299425 (D. Md. Aug. 8, 2025) ......17, 56

*Lembeck v. Arvest Cent. Mortg. Co.*,
    498 F. Supp. 3d 1134 (N.D. Cal. 2020) ...........................................59

iv

*Lomax v. Ortiz-Marzuez,*
    590 U.S. 595 (2020)........................................................................40

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024).............................................................33, 49, 63

*Lowe v. MoneyLion Techs. Inc.,*
    No. 25 Civ. 4098 (DEH), 2026 WL 654719 (S.D.N.Y. Mar. 9, 2026)
    ....................................................................................18, 37, 56

*Milana v. Credit Discount Co.,*
    27 Cal. 2d 335 (1945) .....................................................................42

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth,*
    473 U.S. 614 (1985)........................................................................26

*Moss v. Cleo AI Inc.,*
    799 F. Supp. 3d 1152 (W.D. Wash. 2025) .............................. passim

*Moss v. Klover Holdings, Inc.,*
    No. 25-cv-5758, 2026 WL 622653 (N.D. Ill. Mar. 5, 2026)..............18

*Odier v. Hoffmann Sch. of Martial Arts, Inc.,*
    619 F. Supp. 2d 571 (N.D. Ind. 2008) ..............................................53

*Olson v. Unison Agreement Corp.,*
    2025 WL 2254522 (9th Cir. Aug. 7, 2025) .......................................48

*Orubo v. Activehours, Inc.,*
    780 F. Supp. 3d 927 (N.D. Cal. 2025) ...........................17, 38, 56, 62

*Pennsylvania Department of Public Welfare v. Davenport,*
    495 U.S. 552 (1990)........................................................................46

*Pope v. Marshall,*
    78 Ga. 635, 4 S.E. 116 (1887) ..................................................... 42, 49

*Ramirez v. Activehours, Inc.,*
    No. 25-cv-03625-PCP, 2026 WL 828299 (N.D. Cal. Mar. 25, 2026) 18,
    38, 56, 65

*Revell v. Grant Money, LLC,*
    808 F. Supp. 3d 1036 (N.D. Cal. 2025) ..................................... passim

*Riggs v. Gov. Employees Fin. Corp.,*
    623 F.2d 68 (9th Cir. 1980) .............................................................. 41

*Russell v. Dave Inc.,*
    No. 2:25-cv-04029-MRA-MBK, 2025 WL 3691977 (C.D. Cal. Dec. 12,
    2025) ............................................................................ 17, 36, 56, 66

*San Jose Christian Coll. v. City of Morgan Hill,*
    360 F.3d 1024 (9th Cir. 2004) ......................................................... 29

*Shearson/Am. Exp., Inc. v. McMahon,*
    482 U.S. 220 (1987) ......................................................................... 26

*Steines v. Westgate Palace, L.L.C.,*
    113 F.4th 1335 (11th Cir. 2024) ............................................. 4, 27, 28

*United States v. LKAV,*
    712 F.3d 436 (9th Cir. 2013) ........................................................... 32

*United States v. Olander,*
    572 F.3d 764 (9th Cir. 2009) ........................................................... 60

*Veale v. Citibank, F.S.B.*,
    85 F.3d 577 (11th Cir. 1996) ............................................................64

*Xi v. INS*,
    298 F.3d 832 (9th Cir. 2002) ...........................................................40

**Statutes**

10 U.S.C. § 987.............................................................................13, 14, 28
10 U.S.C. § 987(b) ..............................................................................13, 16
10 U.S.C. § 987(d)(1).................................................................................56
10 U.S.C. § 987(e)(3) .................................................................................27
10 U.S.C. § 987(f)(4)...............................................................1, 13, 18, 27
10 U.S.C. § 987(i)(6)..................................................................................14
15 U.S.C. § 1602(f) ...............................................................................15, 29
15 U.S.C. § 1605(a) ...............................................................................15, 57
15 U.S.C. § 1692a(5) ..................................................................................33
9 U.S.C. § 16(a)(1)(A) ..................................................................................3
9 U.S.C. § 2 .................................................................................................26

Ark. Code Ann. § 23-52-203(b)(4)..............................................................64
Kan. Stat. Ann. § 9-2402 ...........................................................................64
Kan. Stat. Ann. § 9-2405 ...........................................................................64
S.C. Code Ann. § 39-5-820 ........................................................................64
S.C. Code Ann. § 39-5-840 ........................................................................64
Utah Code Ann. § 13-78-101 .....................................................................64

**Other Authorities**

Consumer Financial Protection Bureau, *Payday Loans and Deposit
    Advance Products* 24-25 (April 2013) .................................................37
*Debt*, BLACK'S LAW DICTIONARY (12th ed. 2024) .....................................30
*Debt*, MERRIAM-WEBSTER, https://www.merriamwebster.com/
    dictionary/debt .................................................................................31

*Debt*, OXFORD ENGLISH DICTIONARY,
https://www.oed.com/search/dictionary/?scope=Entries&q=debt........31

*Incident*, BLACK'S LAW DICTIONARY (4th ed. 1968) ....................................58

*Obligation*, BLACK'S LAW DICTIONARY (12th ed. 2024) ......................31, 46

*Obligation*, MERRIAM-WEBSTER,
https://www.merriamwebster.com/dictionary/debt............................31

*Official Interpretation of Regulation Z*, 12 C.F.R. pt. 1026, Supp. I, ¶
2(a)(14)-2 ................................................................................34, 36

*Recourse*, BLACK'S LAW DICTIONARY (12th ed. 2024) ........................16, 42

U.S. DEPT. OF DEF., Rep. on Predatory Lending Practices Directed at
Members of the Armed Forces and Their Dependents (Aug. 9, 2006) 12

**Regulations**

10 Cal. Code Regs. § 1461(g) ....................................................................63

12 C.F.R. § 1026.4(a) ....................................................................... passim

12 C.F.R. § 1026.4(a)(1)(ii) ......................................................................75

12 C.F.R. pt. 226, Supp. I, ¶ 2(a)(14)-2................................................38

32 C.F.R. § 232.3(f) ..................................................................................31

32 C.F.R. § 232.3(f)(1)........................................................................16, 32

32 C.F.R. § 232.3(h) ......................................................................... passim

32 C.F.R. § 232.3(n) ..................................................................................16

32 C.F.R. § 232.8(a) ..................................................................................15

*Limitations on Terms of Consumer Credit Extended to Service Members
and Dependents*, 80 Fed. Reg. 43560 (July 22, 2015) ........................41

*Truth in Lending (Regulation Z)*, 76 Fed. Reg. 79772 (December 22,
2011)........................................................................................................38

*Truth in Lending (Regulation Z); Nonapplication to Earned Wage Access
Products*, 90 Fed. Reg. 60069 (Dec. 23, 2025) ............................. passim

*Truth in Lending*, 61 Fed. Reg. 49237 (Sept. 19, 1996).............66, 67, 70

*Truth in Lending*, 65 Fed. Reg. 17129 (Mar. 31, 2000) .............38, 39, 55

## INTRODUCTION

Defendant-Appellant Empower Finance Inc. is a tech-enabled payday lender, issuing payday advances ("Empower Cash Advance") to borrowers through a smartphone app. Plaintiffs-Appellees, Petty Officer Samuel Vickery and Sergeant Rae Fuller, allege Empower charges active-duty servicemembers and their families rates of interest that shatter the Military Lending Act's usury cap. Rather than answer these allegations in court, Empower seeks to force Plaintiffs into private arbitration. But Congress, in plain and unambiguous language, displaced the Federal Arbitration Act for MLA claims: "Notwithstanding section 2 of [the FAA] . . . no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered member." 10 U.S.C. § 987(f)(4).

The district court correctly found the parties' dispute involves the extension of consumer credit. When Empower extended Cash Advances to Plaintiffs, it required them to agree to make repayment of an amount "owed" on a specific "due date" and to preauthorize Empower to debit linked bank accounts to "repay" their advances. The statutory definition of "credit"—"the right granted to a consumer by a creditor to defer

1

payment of debt or to incur debt and defer its payment," 32 C.F.R. § 232.3(h)—describes Empower Cash Advance exactly. As the district court recognized, "[b]y providing users funds and imposing a procedure to collect those funds at a later date, Empower's Cash Advances provide consumers the right to 'incur debt and defer its payment' to Empower and therefore extend 'credit.'" ER-9.

The Order also rightly held Plaintiffs' credit agreements with Empower were subject to a finance charge. The "finance charge" under the MLA is the "cost of consumer credit," and includes "any charge" levied by the creditor "as an incident to or a condition of the extension of credit." 12 C.F.R. § 1026.4(a). This definition requires only that there be a "necessary connection" between the fee and the extension of credit. As the district court held, Instant Delivery Fees (charged by Empower for immediate disbursement of advances) are necessarily connected to the extension of credit. The fees are mandatory to receive the advertised, instant version of Empower Cash Advance and are collected only in conjunction with advances. Instant Delivery Fees are finance charges.

So, Plaintiffs adequately pleaded a dispute involving consumer credit. Twelve district court orders applying the plain language of the

2

same statutes to allegations involving materially similar cash advance products have reached the same conclusion.

But resolution of the merits must wait for a later day before a judge or jury in district court, not by out-of-court arbitral proceedings. Congress said so in crystal clear language. Because this Court's jurisdiction over this appeal rests solely on the FAA and that statute does not apply, this Court lacks jurisdiction to hear this appeal. Therefore, Plaintiffs respectfully request the Court dismiss this appeal for lack of jurisdiction or, in the alternative, affirm the Order and remand so Plaintiffs' claims may be adjudicated in the forum Congress guaranteed them and other servicemembers.

## JURISDICTIONAL STATEMENT

Plaintiffs agree the district court possessed jurisdiction over this lawsuit. They dispute, however, that this Court possesses appellate jurisdiction. Empower bases appellate jurisdiction on the Federal Arbitration Act, which permits interlocutory appeals of orders denying motions to stay or compel arbitration governed by the statute. Appellant's Opening Brief ("AOB") at 5; 9 U.S.C. § 16(a)(1)(A)-(B). Here, the MLA overrides the FAA. *See infra* pages 26–27. Because the FAA does not

apply, neither does its interlocutory appeal provision. This Court therefore lacks appellate jurisdiction. *See Steines v. Westgate Palace, L.L.C.*, 113 F.4th 1335, 1348 (11th Cir. 2024) (finding "the MLA *did* override the FAA" and "dismiss[ing] th[e] interlocutory appeal for lack of jurisdiction") (emphasis in original)

## ISSUES PRESENTED

1. Empower's business is providing short-term payday advances to consumers. As a condition of these advances, the borrower must agree to (1) repay the advance on an agreed and specified repayment date, and (2) pre-authorize Empower to collect repayment by debiting a linked deposit account or debit card. Did the district court err in finding such transactions qualify as "credit" under the MLA?

2. Empower promotes Cash Advances by emphasizing their swiftness, using phrases such as "Instant Cash," "Speed: Instant," "within minutes," and "instant cash and credit." For a borrower to receive instant use of the principal advanced, however, Empower charges a fee that increases with the amount of the advance. Did the district court err in finding that a fee charged to unlock Empower Cash Advances' instant-

disbursement feature, which provides the borrower with the principal advanced for a longer duration, constitutes a "finance charge"?

## STATEMENT OF THE CASE

### I. Factual Background

Empower is a tech-enabled payday lender. In the words of its founder and CEO, "Empower's mission is to solve access to *credit*." ER-62 (emphasis added). To fulfill that mission, "Empower underwrite[s] people based on their bank account data" and if its underwriting shows borrowers can make repayment, "then we [Empower] extend you a small amount of *credit*." *Id.* (emphasis added).

Through a product it calls "Empower Advance" or "Empower Cash Advance," Empower issues short-term payday advances to borrowers through its mobile application. ER-28, 46. Empower markets its advances to consumers "living paycheck to paycheck" who "need a little extra cash between paychecks," promising a cheaper short-term borrowing alternative to traditional payday loan companies while nevertheless charging sky-high fees to access fast cash. ER-35, 46.

5

**A.  Empower extends Cash Advances only to borrowers it deems creditworthy following its rigorous underwriting process.**

To be eligible for Empower Cash Advances, consumers must pay for its monthly subscription service. ER-50–52. Merely subscribing to Empower's service, however, does not guarantee the subscriber will qualify for a Cash Advance. ER-54 (clarifying that "not everyone will qualify for a Cash Advance."). Only subscribers who are deemed creditworthy after Empower's rigorous underwriting process qualify for a Cash Advance.

Before advancing funds, Empower requires prospective borrowers to provide direct and ongoing real-time access to the deposit account where they receive their paychecks. ER-28, 54–56. Empower analyzes "Primary Checking Account transactions" to determine the borrower's creditworthiness by, for example, assessing their "financial health," liquidity, anticipated income, "payments on other debt obligations," and "[re]payment history with Empower cash advances." *Id.* Empower leverages its real-time insight into borrowers' full financial picture to "extend[] loans to borrowers only when it is confident they will repay" when funds become available (*i.e.*, on payday). ER-56. Like traditional

6

credit issuers, Empower extends larger amounts of credit to borrowers who prove (through "positive repayment history") to be a low default risk. ER-57, n. 38.

### B. Empower conditions its Cash Advances on borrowers' agreement to repay an amount due on a specific repayment date, enforced through mandatory pre-authorized repayment debits.

Before issuing Cash Advances, Empower takes measures to ensure repayment. Specifically, Empower conditions its advances on the borrower's agreement to (1) repay the advance on an agreed and specified repayment date, and (2) pre-authorize Empower to collect repayment by debiting a linked deposit account or debit card. ER-28, 57–58. The repayment date for advances is no later than "the payday immediately following any given loan, ensuring their loans are paid as soon as funds become available." ER-25; *accord* ER-28 (providing advance repayment will be processed "when we [Empower] forecast that you will receive your next paycheck"). Empower also requires borrowers to permit repeated collection attempts—that is, to permit Empower to "withdraw small amounts from your Primary Checking Account, until the balance is repaid in full, or withdraw the full amount of the Empower Advance when sufficient funds are in your Primary Checking Account." ER-28, 58.

Empower reinforces these repayment terms in several ways. After an advance is taken, Empower reminds borrowers that "repayment [is] due" on a specific date, that they have a "Total to repay," and that there is a "[dollar amount] Outstanding," as shown in the exemplar screen below:



8

*Id.* at ER-61 fig. 6; *accord* ER-60 fig. 5 (referencing the "due date" for advance repayment).

Although Empower stresses borrowers are "free to revoke authorization for Empower" to collect repayment (AOB at 14), there are no provisions in Empower's terms of service providing a method for avoiding repayment of an advance. *See* ER-28. Rather, those terms provide only for changing the repayment date: "If our forecasted pay date is incorrect, or if you would like to change the date of the debit, please contact us[.]" *Id.* For borrowers who somehow manage not to repay despite Empower's comprehensive collection protocol, Empower prohibits them from using the product—which borrowers are usually dependent on—until the advance is repaid. ER-28, 58.

Repayment, however, is not a problem for Empower. According to its CEO, "[b]ecause we're able to look at your bank account data and your real time information, we're able to [] pick who is in a position to make repayments. And so our loss rates are very, very low." ER-58. More specifically, Empower boasts that its "repayment rates are in the high 90%'s. So it looks much more like a traditional near-prime or prime user than it does a subprime user." *Id.*

9

### C. Empower imposes charges on borrowers to whom it extends Cash Advances.

Empower makes money through two types of fees: (1) expedite fees ("Instant Delivery Fees") and (2) mandatory subscription fees. ER-46.

Empower promotes Cash Advances by emphasizing their swiftness, using phrases such as "Instant Cash," "Speed: Instant," "within minutes," and "instant cash and credit." ER-47. To unlock Cash Advance's touted "instant delivery" feature, Empower charges Instant Delivery Fees that increase with the size of the advance. These fees range from $1 for advances between $0–10.00 up to an uncapped 3% of the advance amount for those $300 or more, ER-28, notwithstanding that its cost to deliver cash instantly is less than $0.05, ER-47.

Empower makes paying for the instant-disbursement feature the *default* delivery method for advances. ER-48–49 & fig. 2. Borrowers who elect the slower option are shown an extra screen, informing them that non-expedited advances take "2 business days" to clear and requiring them to acknowledge the slower timeline. ER-49.

Immediate access to funds—for which an Instant Delivery Fee is required—is a feature of Cash Advances. Empower serves borrowers who "need a little extra cash between paychecks" and can't afford to wait—for

10

instance, using examples from Empower's website, because they need cash at the "[g]rocery checkout," to purchase "[g]as for the car," or to fix a "[f]lat tire[.]" ER-50 n.24.

Empower also charges $8.00 in monthly subscription fees. ER-50–51. Its app provides no mechanism for users to access Cash Advances without paying for a subscription. ER-51–52.

So, borrowers cannot access Cash Advances at all without paying the mandatory subscription fees, and cannot receive a Cash Advance on the instant basis Empower advertises without paying the Instant Delivery Fees.

*   *   *

The military annual percentage rate (MAPR) on these finance charges is breathtaking. Plaintiffs, while on active duty, received Empower Advances carrying MAPRs between **299%** and **1,095%**. ER-64–65 at tbls. 1–2. Plaintiffs received dozens of payday advances from Empower, with each repayment depleting their take-home income, sapping them for costly fees, and necessitating more advances to cover the shortfall created by prior ones. ER-65.

11

This is not merely a moral wrong. *E.g.*, *E.C. Warner Co. v. W. B. Foshay Co.*, 57 F.2d 656, 659 (8th Cir. 1932) ("Usury is a moral taint, and no subterfuge, however cunningly devised, will be permitted to conceal it."). Studies confirm that products like Empower Advance degrade borrowers' financial health by fostering dependence and rampant repeat borrowing, depleting future paychecks through repayments and fees, which cause overdrafts on other accounts to "increase[] 56% on average after use of an advance product." ER-53–54. This is precisely *why* Congress passed the Military Lending Act: to protect servicemembers like U.S. Navy Petty Officer Samuel Vickery and U.S. Army Sergeant Rae Fuller from these harms. *See* U.S. Department of Defense's Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents ("DoD Report")[1] at 3 (noting predatory loans "trap the borrower in a cycle of debt; and leave the borrower in worse financial shape").

---

[1] U.S. DEPT. OF DEF., Rep. on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents (Aug. 9, 2006), https://apps.dtic.mil/sti/pdfs/ADA521462.pdf [https://perma.cc/NAC5-D97H].

## II. Statutory and Regulatory Background

In 2006, the Department of Defense issued a report documenting the harms payday loans inflict on active-duty military servicemembers and their families, finding "[p]redatory lending undermines military readiness, harms the morale of troops and their families, and adds to the cost of fielding an all volunteer fighting force." DoD Report, at 53. To protect military families from these harms and ensure a financially secure fighting force, Congress enacted the MLA, providing myriad protections for covered members of the armed forces and their dependents.

First and foremost, the MLA prohibits creditors from charging more than 36% interest in any consumer credit agreement with a servicemember or their dependent. 10 U.S.C. § 987(b). To name just a few more protections, the MLA requires detailed cost-of-credit disclosures, prohibits agreements requiring borrowers to waive their rights to legal recourse, and prohibits requiring borrowers to provide a check or access to a bank account as security for the obligation. *Id.* §§ 987(c), (e)(2), (3), (5). Crucially, the MLA displaces the Federal Arbitration Act, providing "no agreement to arbitrate *any* dispute involving the extension of

13

consumer credit shall be enforceable" against servicemembers or their dependents. 10 U.S.C. § 987(f)(4) (emphasis added). This provision guarantees access to a judicial forum for *any* dispute they have that involves the extension of consumer credit to servicemembers or their dependents.

The MLA applies to "creditors" who extend "consumer credit" to covered borrowers. Operative terms are defined by statute and DoD regulations. *Id.* §§ 987(h), (i). "Creditor" means an entity "engaged in the business of extending consumer credit." *Id.* § 987(i)(6); 32 C.F.R. § 232.3(h). Notably, the MLA's regulations single out "person[s] engaged in . . . payday loan transactions," like Empower, as meeting this definition. 32 C.F.R. § 232.8(a).

Most salient for purposes of this appeal is the definition of "consumer credit." The MLA adopts the consumer credit definition "provided . . . in regulations" by the DoD. 10 U.S.C. § 987(i)(6). Those regulations, in relevant part, define "consumer credit" as "credit offered or extended to a covered borrower primarily for personal, family, or household purposes, and that is: (i) subject to a finance charge..." 32 C.F.R. § 232.3(f)(1).

14

The terms "credit" and "finance charge" are also defined. "Credit means the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment." 32 C.F.R. § 232.3(h). This definition is substantially similar to the "credit" definition provided by the Truth in Lending Act ("TILA"). *Compare* 32 C.F.R. § 232.3(h), *with* 15 U.S.C. § 1602(f). Finally, MLA regulations adopt Regulation Z's "finance charge" definition, which provides:

> The finance charge is the cost of consumer credit as a dollar amount. It includes *any charge* payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to *or* a condition of the extension of credit.

12 C.F.R. § 1026.4(a) (emphases added); 32 C.F.R. § 232.3(n); *accord* 15 U.S.C. § 1605(a).

As explained below, Empower Cash Advances are subject to the MLA because they constitute "credit" subject to a "finance charge." *Id.*

### III. Procedural Background

On March 25, 2025, P.O. Vickery initiated this action in California Superior Court in San Francisco County, alleging claims under the MLA and TILA, individually and on behalf of two putative classes. ER-78. On April 28, Empower removed the action to the U.S. District Court for the Northern District of California. ER-77. On July 7, P.O. Vickery and Sgt.

15

Fuller filed the operative First Amended Complaint, alleging the same claims while adding a claim under Georgia law. ER-34–74.

P.O. Vickery and Sgt. Fuller allege Empower violates the MLA by, among other things, extending Cash Advances that carry interest exceeding the Act's usury cap and omitting mandatory cost-of-credit disclosures. ER-63–65, 69–71; 10 U.S.C. §§ 987(b), (c).

On August 4, 2025, Empower filed its Motion to Compel Arbitration and Stay Litigation. ER-88. There, Empower sought to compel arbitration notwithstanding the MLA's clear override of the FAA and proscription against enforcing arbitration, arguing Cash Advances are not consumer credit under the MLA because they are "non-recourse"[2] and associated fees are notionally optional. On August 18, Plaintiffs filed their Response in Opposition to Defendant's Motion. ER-88. Plaintiffs

---

[2] Though Empower characterizes its product as "non-recourse" because it waived its right to pursue some collection remedies, "non-recourse" is a misnomer. Recourse is defined as "[e]nforcement of, or a method for enforcing, a right." *Recourse*, BLACK'S LAW DICTIONARY (12th ed. 2024). And it is undisputed that, for each advance, borrowers must agree to Empower's "enforcement of, or [] method for enforcing" its right to repayment—namely, through pre-authorized debits from linked bank accounts. Empower thus provides *recourse* Cash Advances. Accordingly, Plaintiffs intentionally set off in quotation marks each reference to "non-recourse."

16

explained the MLA's unambiguous text prohibits enforcement of any arbitration agreement because Empower Cash Advances constitute extensions of credit subject to a finance charge under the applicable statutory definitions, and thus fall within the purview of the MLA. The Court held a hearing on October 2, 2025. ER-89.

## IV.    The Order on Review

The Order on review is one in an unbroken line of district court decisions that have rejected the same arguments Empower makes in this appeal, including whether the transactions constitute "credit" subject to a "finance charge" under the MLA and TILA. *See Orubo v. Activehours, Inc.*, 780 F. Supp. 3d 927 (N.D. Cal. 2025); *Johnson v. Activehours, Inc.*, No. 1:24-cv-2283, 2025 WL 2299425, at *8 (D. Md. Aug. 8, 2025) (similar); *Golubiewski v. Activehours, Inc.*, No. 1:24-cv-02283-JRR, 2025 WL 2484192 (M.D. Pa. Aug. 28, 2025); *Moss v. Cleo AI Inc.*, 799 F. Supp. 3d 1152 (W.D. Wash. 2025); *Revell v. Grant Money, LLC*, 808 F. Supp. 3d 1036 (N.D. Cal. 2025); *Russell v. Dave Inc.*, No. 2:25-cv-04029-MRA-MBK, 2025 WL 3691977 (C.D. Cal. Dec. 12, 2025); *Burrison v. FloatMe, Corp.*, No. 25-cv-10885-DJC, 2026 WL 444638 (D. Mass. Feb. 17, 2026); *Moss v. Klover Holdings, Inc.*, No. 25-cv-5758, 2026 WL 622653 (N.D. Ill.

17

Mar. 5, 2026); *Lowe v. MoneyLion Techs. Inc.*, No. 25 Civ. 4098 (DEH), 2026 WL 654719 (S.D.N.Y. Mar. 9, 2026); *Ramirez v. Activehours, Inc.*, No. 25-cv-03625-PCP, 2026 WL 828299 (N.D. Cal. Mar. 25, 2026); *Feeman v. Bridge IT, Inc.*, No. 25-cv-3806 (LJL), 2026 WL 880508 (S.D.N.Y. Mar. 30, 2026).

After oral argument, the district court issued its Order finding the arbitration provision unenforceable under the MLA and, thus, denying the Motion. ER-3–13. In the Order, Judge Corley carefully reviewed Plaintiffs' allegations and Empower's terms of service relating to Empower Advances, ER-3–5, and correctly observed that "the MLA overrides the FAA." ER-5–7 (quoting 10 U.S.C. § 987(f)(4)) (emphasis added).

Empower conceded, as it must, that the MLA overrides the FAA for disputes involving extensions of consumer credit to covered members. ER-6. But it argued its Cash Advances are not regulated by the MLA or TILA (or presumably any lending laws whatsoever), and thus do not implicate the MLA's arbitration ban, because "Empower is not a 'creditor [] extend[ing] consumer credit.'" *Id.* The district court rightly rejected Empower's contention, finding Plaintiffs' allegations, confirmed by

18

Empower's terms of service, stated a plausible claim that Empower is a creditor and its Cash Advances are consumer credit subject to a finance charge.

For its credit analysis, the Order found the undisputed mechanics of Cash Advance transactions fit neatly within the MLA's "credit" definition: "By providing users funds and imposing a procedure to collect those funds at a later date, Empower's Cash Advances provide consumers the right to 'incur debt and defer its payment' to Empower and therefore extend 'credit.'" ER-8 (quoting 32 C.F.R. § 232.3(h)). Bolstering that conclusion, Judge Corley found Empower Cash Advances constitute the type of transactions that Regulation Z's official commentary characterizes as credit. *Id.*

The court rejected Empower's arguments that it does not extend "credit" simply because it "describes its advances as 'non-recourse' and disavows" the ability to sue borrowers or engage in debt collection activities to enforce its repayment rights and borrowers' obligation to repay. ER-10. The Order rejected the premise that only a "*legal* obligation" enforceable in court or through debt collection methods could constitute a debt. *Id.* Indeed, the court noted that even Empower's

19

preferred dictionary definition of "debt" foreclosed such a constrained reading. *Id.* ("[U]sers incur debt because, upon receiving a Cash Advance, 'a specific sum of money [becomes] due by agreement' with Empower, which Empower will automatically collect.").

Next, the court rejected Empower's suggestion that borrowers have no "obligation to repay" because, according to Empower, they theoretically can disconnect their payment accounts to avoid repayment. *Id.* After all, as Judge Corley explained, such borrowers still undertook an obligation at the time of the Cash Advance by agreeing to repay the debt on a specified date and by "giv[ing] Empower permission to collect repayment[.]" *Id.* Additionally, even if a borrower were to successfully disconnect their account, Empower "retains some right to repayment by 'reserv[ing] the right to deny [] access to Empower advance if . . . [a user] do[es] not repay the full balance of an Empower Advance.'" *Id.* (quoting ECF No. 26-8 at 5). So, Empower not only enforces its right to repayment by automatically debiting borrowers' accounts on payday or a later date, but it also restricts access to its services unless and until borrowers pay their "outstanding" debt. As the court cogently explained: "That some

20

users avoid their obligation to repay Empower does not mean no obligation ever exists." ER-11.

Turning to the finance charge issue, the court began its analysis with the statutory definition of "finance charge." *Id.* The court noted that the Supreme Court interprets the "phrase 'incident to or in conjunction with'" (from the finance charge definition) to imply "some *necessary* connection" between a finance charge and extension of credit, which is not to be confused with a required *condition* of receiving credit. ER-11 (quoting *Household Credit Servs. v. Pfennig*, 541 U.S. 232, 240–41 (2004)) (emphasis in original). Applying the finance charge definition to the facts of this case was straightforward: "Users must pay the Instant [Delivery] Fee[3] to obtain an Empower Cash Advance instantly, so the Instant [Delivery] Fee is at least 'incident to' Empower's ***instant*** extension of credit." ER-11. Because borrowers must pay an Instant Delivery Fee to unlock the instant-disbursement feature of Empower Advance, that fee is "incident to" the extension of credit with that feature. ER-11–12.

---

[3] For clarity, Plaintiffs note the district court used the phrase "Instant Transfer Fee" to reference the same fee. *E.g.*, ER-11–14. Plaintiffs continue to use the term "Instant Delivery Fee," consistent with Empower's terms of service and the Complaint. *See* ER-28, 46.

Judge Corley rejected Empower's argument that a "finance charge[]" must be a mandatory condition of obtaining credit" as inconsistent with the statutory and regulatory finance charge definition and with *Pfennig*. ER-12. Indeed, the lone district court decision cited by Empower to support its argument "subsequently reversed its interpretation upon 'a deeper review of the law' and held plaintiffs only needed allege 'a *connection* between [fees] and the extension of credit.'" ER-12–13 (quoting *Golubiewski*, 2025 WL 2484192, at *6). The court was also unpersuaded by the non-binding, pre-*Pfennig* circuit court authority and Regulation Z commentary upon which Empower relied. ER-13.

Having concluded Empower Cash Advances constitute consumer credit and Instant Delivery Fees are finance charges, the district court found "the MLA prohibits Empower from compelling Plaintiffs to arbitrate their MLA claims." ER-14. And because the MLA prohibits arbitration of "any dispute involving the extension of consumer credit," not merely MLA claims, the court likewise declined to compel Plaintiffs' TILA or GPLA claims to arbitration. ER-14–15.

On October 8, 2025, Empower filed its notice of appeal. ER-90.

22

## SUMMARY OF ARGUMENT

In plain, unambiguous language, the MLA displaces the FAA for disputes involving the extension of consumer credit to servicemembers. Empower Cash Advances constitute consumer credit subject to the MLA's protections, including, most importantly for this appeal, its arbitration ban. The district court correctly denied Empower's motion to compel arbitration of Plaintiffs' claims.

**First**, Plaintiffs plausibly pleaded that Empower Cash Advances constitute consumer credit and thus the parties have a dispute involving the extension of consumer credit. "Credit" means "the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment." 32 C.F.R. § 232.3(h). The Complaint alleges facts (which Empower's terms of service confirm) placing Cash Advance squarely within this definition. Each time P.O. Vickery and Sgt. Fuller took an advance, they promised to repay Empower a specific amount on a specific date and were required to preauthorize Empower to debit their linked bank account or debit card. Those agreements constitute credit.

**Second**, Empower's "non-recourse" provision does not alter the analysis. Empower's choice to voluntarily waive some methods for

23

enforcing its repayment rights does not mean Cash Advances are not credit. Empower's contrary argument relies on an invented "legal recourse in court" prerequisite that exists nowhere in the applicable statutes, regulations, or caselaw. Empower's waiver of some enforcement methods does not eliminate the repayment obligation that Plaintiffs undertook each time they took a Cash Advance.

**Third**, Plaintiffs plausibly allege Instant Delivery Fees are "finance charges." Regulation Z defines "finance charge" as the cost of consumer credit, which includes any charge imposed by the creditor "as an incident to or a condition of the extension of credit." 12 C.F.R. § 1026.4(a). Servicemembers must pay an Instant Delivery Fee to receive the principal of their advances "instantly" or "within minutes." The fee is thus connected to the extension of credit and fits comfortably within Regulation Z's definition of finance charge. Unsurprisingly, every court to consider analogous fees in analogous contexts has reached this commonsense conclusion.

For all these reasons, more fully set forth below, the Order on appeal was correctly decided. Plaintiffs respectfully request this Court dismiss this appeal for lack of jurisdiction or, in the alternative, affirm

24

the district court's order and remand this case for further proceedings in the judicial forum that Congress guaranteed to Plaintiffs and other servicemembers for resolving disputes involving consumer credit.

## STANDARD OF REVIEW

This Court reviews *de novo* orders denying motions to compel arbitration. *Holley-Gallegly v. TA Operating, LLC*, 74 F.4th 997, 1000 (9th Cir. 2023).

## ARGUMENT

The Order should be affirmed because: (i) Empower's Cash Advance product constitutes consumer credit within the meaning of the MLA; and (ii) Instant Delivery Fees are finance charges. As such, the parties have a dispute involving the extension of consumer credit falling within the purview of the MLA. Because the MLA applies, the FAA does not, and the district court correctly found it lacked authority to compel Plaintiffs' claims to arbitration.

Plaintiffs begin by showing the MLA, if implicated, displaces the FAA and prohibits enforcement of arbitration agreements and then turn to showing that, here, the MLA is indeed implicated. So, the district court properly denied the Motion and its Order must be affirmed.

## I. The MLA Displaces the FAA and Prohibits Enforcement of Arbitration Agreements as to Disputes Involving Consumer Credit

The FAA generally requires enforcement of arbitration agreements. 9 U.S.C. § 2. But "[l]ike any statutory directive, the [FAA's] mandate may be overridden by a contrary congressional command." *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226–27 (1987). Thus, a party cannot enforce an arbitration agreement if "Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 628 (1985).

Put differently, district courts cannot compel arbitration of claims that fall outside the scope of the FAA. "That is because, if a contract falls within an FAA-exempt category, the district court has no power at all to compel arbitration[.]" *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1034 (9th Cir. 2022). The district court was required to determine whether it had the power to compel Plaintiffs' claims to arbitration. *Accord New Prime Inc. v. Oliveira*, 586 U.S. 105, 111 (2019). It correctly concluded it lacked that power.

26

Congress explicitly placed disputes covered by the MLA outside the reach of the FAA: "Notwithstanding section 2 of title 9 [the FAA], . . . no agreement to arbitrate *any* dispute involving the extension of consumer credit shall be enforceable against any covered member." 10 U.S.C. § 987(f)(4) (emphasis added). In unequivocal language, Congress guaranteed servicemembers and their dependents a day in court. *Steines*, 113 F.4th at 1343 ("The statutory text of the MLA couldn't be clearer that where the MLA applies, the FAA does not."). Therefore, the FAA does not apply to Plaintiffs' dispute with Empower, and the district court lacked authority to enforce the arbitration provision.

Empower does not dispute that "the MLA prohibits arbitration of claims by servicemembers with respect to" extensions of consumer credit. AOB at 2. Instead, Empower's only dispute is whether its Cash Advances are credit subject to a finance charge, and thus trigger the MLA's application.

## II. The Parties' Dispute Involves the Extension of Consumer Credit under the MLA

As set forth above, the MLA displaces the FAA for any claim a Covered Borrower brings involving the extension of consumer credit. The key question, then—and the only question in dispute—is whether

27

Plaintiffs' claims involve the extension of consumer credit. They do. So, the district court correctly held it could not compel those claims to arbitration.

The MLA applies to: (1) credit agreements that are (2) subject to a finance charge. 10 U.S.C. § 987; 32 C.F.R. § 232.3(f). Plaintiffs alleged facts (buttressed by Empower's terms of service) sufficient to state a claim that Empower Cash Advances meet these definitions.

Because Plaintiffs' allegations, coupled with Empower's terms of service, demonstrate the parties have a "dispute involving the extension of consumer credit"—a credit agreement subject to a finance charge—the MLA applies and overrides the FAA. This Court, therefore, "lack[s] any source of appellate jurisdiction" and should dismiss this appeal so litigation may proceed in the normal course. *See Steines*, 113 F.4th at 1348. Alternatively, this Court should affirm the Order on appeal on its merits. Either way, the outcome is the same: Plaintiffs' claims cannot be compelled to arbitration.

### A. Plaintiffs plead facts, confirmed by Empower's terms, that demonstrate Cash Advances are "credit."

Consumer credit under the MLA is "credit offered or extended to a covered borrower primarily for personal, family, or household purposes,

28

and that is [] subject to a finance charge[.]" 32 C.F.R. § 232.3(f)(1).

"Credit," in turn, is defined as "the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment." 32 C.F.R. § 232.3(h); *accord* 15 U.S.C. § 1602(f) (providing similar definition under TILA). Because the MLA does not define "debt," the term is given its "ordinary meaning." *See FCC v. AT&T Inc.*, 562 U.S. 397, 403 (2011).

### i. All relevant sources of ordinary meaning demonstrate that Empower Cash Advances constitute "credit."

Every relevant source of ordinary meaning—dictionary definitions, parallel statutes, official Regulation Z commentary, district court holdings, the DoD's 2015 MLA rule, and even the CFPB's recent nonbinding Advisory Opinion—support the conclusion that Empower Cash Advance transactions are "credit" under the MLA.

**Dictionary definitions**:[4] "Debt" is defined as "[l]iability on a claim; a specific sum of money due by agreement or otherwise." *Debt*, BLACK'S LAW DICTIONARY (12th ed. 2024). In 1968, when TILA was

---

[4] Dictionary definitions provide a suitable starting place for discerning ordinary meaning. *E.g., San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004).

enacted, Black's defined "debt" similarly as "[a] sum of money due by certain and express agreement." *Debt*, BLACK'S LAW DICTIONARY (4th ed. 1968). Other dictionaries similarly define "debt" as "something owed; obligation," or "a state of being under obligation to pay or repay someone or something in return for something received; a state of owing." *Debt*, MERRIAM-WEBSTER, https://www.merriamwebster.com/ dictionary/debt; *see also Debt*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/search/dictionary/?scope=Entries&q=debt ("That which is owed or due.").

The word *obligation*, in turn, simply means a "legal or moral duty to do or not do something," which may arise from a "duty [] imposed by law, contract, promise, social relations, courtesy, kindness, or morality." *Obligation*, BLACK'S LAW DICTIONARY (12th ed. 2024);[5] *accord Obligation*, MERRIAM-WEBSTER, https://www.merriamwebster.com/dictionary/debt ("**1:** the action of obligating oneself to a course of action (as by a promise

---

[5] In 1968, Black's defined "obligation" as "[a] generic word…having many, wide, and varied meanings, according to the context in which it is used." *Obligation*, Black's Law Dictionary (4th ed. 1968). The first substantive definition defined "obligation" as "That which a person is bound to do or forbear; any duty imposed by law, promise, contract, relations of society, courtesy, kindness, etc." *Id.*

30

or vow) **2a:** something (such as a formal contract, a promise, or the demands of conscience or custom) that obligates one to a course of action").

These definitions of "debt" demonstrate that the Complaint alleges, and Empower's terms of service confirm, Cash Advance transactions allowed Plaintiffs "to incur debt and defer its payment." *See* 32 C.F.R. § 232.3(h). Empower loaned Plaintiffs money in exchange for their promise to "repay" a specific amount "outstanding" and "due" on the "repayment date." *See* 32 C.F.R. § 232.3(h); ER-28, 49, 57. In Empower's own words, when an advance is taken, "repayment [is] due" on a specific "due date" or "repayment date" and borrowers have a "Total to repay" and "[dollar amount] Outstanding." ER-49, 61. These representations to borrowers "support a mutual understanding that customers must repay the" advance. *See Revell*, 808 F. Supp. 3d at 1050; *Feeman*, 2026 WL 880508, at *8 (finding cash advance provider's reference to a "due date" "connote[d] a sum 'owed or owing as a debt.'" (internal quotation omitted)). Empower Cash Advances thus enabled Plaintiffs to "incur debt and defer its payment" until payday.

31

**Debt defined by other federal statutes**:[6] The Fair Debt Collection Practices Act defines "debt" as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money…which [is] the subject of the transaction [is] primarily for personal, family, or household purposes[.]" 15 U.S.C. § 1692a(5). This definition easily encompasses Empower Cash Advance transactions because, for each advance, borrowers take on an "obligation or alleged obligation … to pay money arising out of a transaction." *See id.*; *see also Moss*, 799 F. Supp. 3d at 1159 (holding the FDCPA's definition of "debt" "do[es] not mandate . . . [the] formalistic requirement" that the lender possess a "contractual or legal claim" against the borrower for failure to repay an advance).[7]

**Official Regulation Z Commentary**: The Federal Reserve Board's official commentary to Regulation Z bolsters Plaintiffs' position.[8]

---

[6] Language used in other statutes can "aid in interpretation" of undefined terms. *United States v. LKAV*, 712 F.3d 436, 440 (9th Cir. 2013).

[7] Ironically, Empower argues the FDCPA's definition of debt supports its position. It does not. The FDCPA defines "debt" as an "obligation or alleged obligation to pay money," not an "***unconditional*** obligation [enforceable in court or through debt collection methods]." *Compare* 15 U.S.C. § 1692a(5), *with* AOB at 14.

[8] "Because Congress directed DoD and the Federal Reserve Board to 'fill up the details of [the] regulatory scheme[s]' of the MLA and the TILA,

Specifically, the FRB issued on-point commentary[9] applying TILA's credit definition in the payday advance context, explaining payday advances materially identical to Empower Cash Advances constitute consumer credit:

> **Payday loans; deferred presentment**. Credit includes a transaction in which a cash advance is made to a consumer . . . in exchange for the consumer's authorization to debit the consumer's deposit account, and where the parties agree . . . that the consumer's deposit account will not be debited, until a designated future date. This type of transaction is often referred to as a "payday loan" or "payday advance" or "deferred-presentment loan."

*Official Interpretation of Regulation Z*, 12 C.F.R. pt. 1026, Supp. I, ¶ 2(a)(14)-2, *Credit*.

---

respectively, the agencies' reasoned interpretations, within the constitutional bounds of its delegated authority, are entitled to deference." ER-10 (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024)).

[9] The relevant official commentary addressed in this section was originally issued by the FRB. 65 Fed. Reg. 17129. After the Dodd-Frank Wall Street Reform and Consumer Protection Act transferred rulemaking authority under the TILA to the Consumer Financial Protection Bureau, the CFPB published a rule reissuing a substantively identical version of the same commentary. *Compare* 65 Fed. Reg. 17129, 17131, *codified at* 12 CFR 226.4, Supp. I, Paragraph 2(a)(14)-2, *with Truth in Lending (Regulation Z)*, 76 Fed. Reg. 79772, 79919 (December 22, 2011), *recodified at* 12 CFR 1026.4, Supp. I, Paragraph 2(a)(14)-2 (CFPB reissuing older FRB official staff commentary verbatim).

When it was issued, the FRB explained the commentary provided "an example of a specific type of transaction that involves an agreement to defer payment of a debt." *Truth in Lending*, 65 Fed. Reg. 17129, 13130 (Mar. 31, 2000). Because payday advance transactions "fall[] within the existing statutory and regulatory definition of 'credit,' the comment does not represent a change in the law." *Id.*

The FRB commentary was aimed at all transactions structured like a payday advance, "*however they are described*—as payday loans, **cash advances**, check advance loans, deferred presentment transactions, or by another name." *Id.* (emphases added). So, a creditor that delivers a "cash advance" to a consumer in exchange for authorization to debit the consumer's account on a future date is extending "credit." The FRB's description of this category of regulated credit products describes Empower Cash Advance perfectly.

And yet, Empower claims this commentary "addresses traditional payday loans and deferred presentment transactions" that create "irrevocable payment obligations." AOB, at 42. But there is no support in the commentary's text or its accompanying explanation for this stilted interpretation. Seeking to sidestep the text, Empower invents an

34

"irrevocable obligation" requirement where there is none, arguing the FRB's "use of the words 'exchange' and 'agree' connotes a contractual obligation to repay[.]" *Id.* Empower's fixation on these words does not help its cause—for each Empower Cash Advance, Empower advances cash "*in exchange* for . . . the consumer's authorization to debit the consumer's deposit account, and [] the parties *agree* . . . the consumer's deposit account will not be debited, until" a designated future date." *See* 12 C.F.R. pt. 1026, Supp. I, ¶ 2(a)(14)-2; ER-28.

Empower's argument concerning the Regulation Z commentary directly conflicts with the operative statutory and regulatory text. The Order rightly found the FRB's Regulation Z commentary supports that Empower Cash Advance is credit. ER-9–10.

**DoD 2015 Rule Addressing Deposit Advances**: In its 2015 MLA rule, the DoD stated:

> Most, if not all, 'deposit advance' products would (when offered to a covered borrower) be covered as consumer credit because this type of product typically involves credit . . . for which the borrower pays any fee or charge that is, or is expected to be, repaid from funds available in the borrower's asset account held by that creditor.

*Limitations on Terms of Consumer Credit Extended to Service Members and Dependents*, 80 Fed. Reg. 43560, 43561, 43579–80 (July 22, 2015).

35

Like Empower Advance, deposit advances are "typically structured as short-term loans": advances are requested online or over the phone, and borrowers "stipulate that repayment will automatically be taken out of the borrower's next [] electronic deposit." Consumer Financial Protection Bureau, *Payday Loans and Deposit Advance Products* 24–25 (April 2013), available at http://files.consumerfinance.gov/f/201304_cfpb_payday-dap-whitepaper.pdf.

Like Empower does with Cash Advance, deposit advance providers make advances available to "deposit account holders who have recurring electronic deposits, such as a direct deposit of their paycheck, to their accounts." *Id.* at 6–7. Thus, the DoD's treatment of "deposit advance" products supports treating Empower Cash Advance as credit.

**District Courts' Consumer Credit Holdings Relating to Similar Products**: Courts applying the same MLA- and TILA-derived definitions to similar allegations have unanimously agreed these transactions meet the definition of consumer credit. *See, e.g.*, *Revell*, 808 F. Supp. 3d at 1049 ("Defendants' EWA product allows customers to 'defer payment of debt' and thus, Defendants extend 'credit.'"); *Russell*, 2025 WL 3691977, at *6 (concluding that "similar cash advance programs

36

constitute 'credit' within the meaning of the TILA" and MLA); *Feeman*, 2026 WL 880508, at *8 ("The 'advances' provided by Brigit describe debt to a tee."); *Moss*, 799 F. Supp. 3d 1152 (similar); *Burrison*, 2026 WL 444638, at *5–7 (similar); *Lowe*, 2026 WL 654719, at *3 (similar).

This consensus is unremarkable, given that the statutory and regulatory definitions of credit support only one reasonable conclusion: App-based cash advances in which the borrower agrees to repay a specific amount "due" on a specified "repayment date," and for which pre-authorized repayment debits are required, constitute credit. Empower's contrary argument is wrong and has unsurprisingly been repeatedly and comprehensively rejected.

Empower hardly mentions these persuasive decisions,[10] acknowledging some of them only in an oblique footnote, arguing they "do not address the plain meaning of 'debt'" and "erred by deferring to a 2024 proposed interpretive rule from the CFPB that the CFPB has now formally withdrawn and officially rejected." AOB at 46, n.11. That's false. Each court to address whether similar payday advance products

---

[10] To be sure, *Klover*, *Ramirez*, *Burrison*, *Lowe*, and *Feeman* were decided after Empower filed its opening brief.

constituted credit necessarily "address[ed] the plain meaning of 'debt'"—Empower's real qualm is these courts declined to insert the atextual gloss (that debt means unconditional obligation enforceable in court) Empower demands. And none of the decisions mention the CFPB's proposed interpretive rule in their credit analyses.[11] These independent jurists all reached the same conclusion because it is correct and the textual meaning is plain and clear.

### ii. The "non-recourse" provision in the Cash Advance terms does not preclude credit treatment.

Empower disputes neither that Plaintiffs owed it money when an advance was outstanding, nor that Plaintiffs were obligated to repay an amount due on a specific date, and had pre-authorized repayment, when Empower extended a Cash Advance. Instead, Empower argues its advances are not credit because "there is no ***unconditional*** obligation to repay any Empower Advance." ER-28 (emphasis added). This is

---

[11] *Orubo* and *Ramirez* were the only decisions (out of twelve) to mention the CFPB's 2024 proposed rule, and even then only as an ancillary basis supporting the court's plain meaning construction of the finance charge definition provided by 15 U.S.C. § 1605(a). *See Orubo*, 780 F. Supp. 3d at 937–38; *Ramirez*, 2026 WL 828299, at *7.

immaterial to whether Cash Advances constitute credit, and the district court properly rejected the argument.

According to Empower, the MLA applies to credit transactions involving a "contractual or legal repayment obligation," and its "non-recourse" clause prevents the creation of one. AOB at 24–25. But Empower's argument depends on an invented "***unconditional obligation*** [enforceable in court]" prerequisite for consumer credit that exists nowhere in the applicable statutes, regulations, caselaw, or common sense. Put simply, an unpaid debt is a debt—and a debt that might later be forgiven or avoided if some unlikely contingency occurs is still a debt.

First, whether a cash-advance product meets the definition of "credit" does not hinge on whether a creditor voluntarily waives some available methods for enforcing repayment. Accepting Empower's argument would require reading "a limitation into the statute that does not exist." *Revell*, 808 F. Supp. 3d at 1050; *accord, e.g.*, *Moss*, 799 F. Supp. 3d at 1159 ("Accepting [this] narrow interpretation would improperly introduce a legal requirement where Congress and regulators have not."); ER-10 ("[N]either Black's Law Dictionary nor the MLA…require a

39

consumer receiving money and entering into debt to have a *legal* obligation to repay that debt.").

As this Court has done in other statutory contexts, it should decline Empower's invitation to "judicially create an exception to the" MLA because to do so "would add a contingency [] that Congress did not include in the statute." *See E.E. v. Norris Sch. Dist.*, 4 F.4th 866, 873 (9th Cir. 2021); *accord Xi v. INS*, 298 F.3d 832, 839 (9th Cir. 2002) ("[A] decision to rearrange or rewrite [a] statute falls within the legislative, not the judicial, prerogative."); *Lomax v. Ortiz-Marzuez*, 590 U.S. 595, 600 (2020) (courts cannot "narrow a provision's reach by inserting words Congress chose to omit").

Second, Empower's argument that its product is offered on a "non-recourse basis" and Plaintiffs never had an "obligation to repay an advance" is wrong on the facts. AOB at 20; ER-28. Recourse means "[e]nforcement of, or a method for enforcing, a right." *Recourse*, BLACK'S LAW DICTIONARY (12th ed. 2024). Clearly, Empower had a "method for enforcing its right" to repayment of the cash advance. The Complaint alleges (and Empower's terms confirm) that, among other methods of enforcing its right to repayment, Empower (1) required borrowers to

40

provide access to their deposit accounts and provide authorization to debit their linked accounts or debit card, either on the "repayment date" or after new funds were deposited to an account with insufficient funds to repay, and (2) prohibited borrowers with an outstanding advance from accessing future Cash Advances. ER-28, 45, 57–59. Empower's assertion that its loans are "non-recourse" is nonsense.[12]

Third, "because the MLA was designed to protect customers from predatory loans, the statutory text must be read broadly." *Revell*, 808 F. Supp. 3d at 1050. Likewise, "[c]ourts must liberally construe TILA to protect consumers and 'look[] past the form of the transactions to their economic substance.'" *Moss*, 799 F. Supp. 3d at 1159 (quoting *Burnett v. Ala. Moana Pawn Shop*, 3 F.3d 1261, 1262 (9th Cir. 1993)); *cf. Riggs v. Gov. Employees Fin. Corp.*, 623 F.2d 68, 71 (9th Cir. 1980) ("It is well

---

[12] Not only is the requirement to pre-authorize repayment from a deposit account recourse, it is effective recourse. According to its CEO, Empower's "repayment rates are in the high 90%'s" and its "loss rates are *very, very low*." ER-58; *accord Feeman*, 2026 WL 880508, at \*10 (finding a "non-recourse" payday advance provider's ACH pre-authorization "against the consumer's bank account (much like having a physical check) is undoubtedly more valuable to the creditor and provides greater security than being forced to go to court and enforce a judgment").

established that [TILA] is to be liberally construed to effectuate its remedial purpose.").

The economic substance principle has added force in the usury context, as courts have for more than a century looked past labels and "cunning devices" to ensure usury limitations are not evaded by subterfuge. *See, e.g.*, *E.C. Warner Co.*, 57 F.2d at 659 ("If it appears that the transaction [] was in substance a receiving or contracting for the receiving of usurious interest for a loan or forbearance of money, then, regardless of the forms or devices resorted to conceal the character of the transaction, the parties thereto are subject to the consequences provided by the usury statutes."); *Milana v. Credit Discount Co.*, 27 Cal. 2d 335, 340 (1945) (noting courts must "pierce the veil of any plan designed to evade the usury law and in doing so . . . disregard the form and consider the substance"); *Pope v. Marshall*, 78 Ga. 635, 640, 4 S.E. 116 (1887) ("No disguise of language can avail for covering up usury, or glossing over an usurious contract. The theory that a contract will be usurious or not according to the kind of paper bag it is put up in, or according to the more or less ingenious phrases made use of in negotiating it, is altogether

42

erroneous. The law intends that a search for usury shall penetrate to the substance.").

Considering the substance of Cash Advance transactions—*i.e.*, the designed function and operation, consistent with their terms of service—they constitute credit transactions under the MLA. *Cf. In re Miller*, 215 B.R. 970, 974 (E.D. Ky. Bkr. 1997) ("[The defendants] are disbursing funds to people like the plaintiff on the promise of repayment of the sum plus the 'service charge,' at a later time. If this is not an extension of credit, [it is] hard to imagine any transaction that is.").

### iii. Empower erroneously contends that its choice to waive judicial remedies means its borrowers never had an obligation to repay a Cash Advance in the first place.

Empower argues that because Cash Advances are purportedly "non-recourse," that Plaintiffs never had any obligation to repay them. This argument turns on the meaning of "obligation," which Empower fails to define anywhere in its brief. *See generally* AOB. By keeping the term undefined, Empower attempts to manufacture ambiguity to enable its argument that obligation means "unconditional obligation" or

43

"obligation [enforceable in court]." *Id.* at 14, 25.[13] This narrow interpretation goes far beyond what any definition could support in the context of these claims.

Empower conflates "repayment obligation" with "retention of judicial remedies," which it waived. Obligations, however, are not so confined. One takes on an obligation when they assume a "legal or moral duty to do or not do something," stemming from a "law, contract, promise, social relations, courtesy, kindness, or morality." *See Obligation*, BLACK'S LAW DICTIONARY (12th ed. 2024); *cf. Revell*, 808 F. Supp. 3d at 1050 (finding that similar cash advance "product [] requires promise of repayment, and therefore constitutes 'credit'").

Each time Empower extended an advance to Plaintiffs, they took on a "repayment obligation" and Empower had a "right to repayment" that

---

[13] In a similar bid to cherry pick definitions Empower deems helpful, Empower fixates on the word "liability," which is found in *one of the four* definitions of "debt" Empower recites from Black's Law Dictionary. AOB at 39–40. Empower does not explain why its chosen "liability" definition takes precedence over the others. Regardless, this handpicked definition is no silver bullet. Liability is defined as "an obligation, one is bound in law or justice to perform," AOB at 40, and for each Cash Advance received, Plaintiffs took on an "obligation" pursuant to an enforceable promise to repay the amount due on the repayment date via pre-authorized debit.

it enforced through mandatory pre-authorized repayment debits in addition to backup collection measures. *Cf.* AOB at 38. Empower's "right to repayment" is what permits it to debit borrowers' accounts. *See* ER-28, 46, 49, 57; *Feeman,* 2026 WL 880508, at \*10 ("All of the elements necessary to create a binding legal obligation are satisfied when the consumer requests an advance and Brigit agrees to extend one."). Without that right to enforce Plaintiffs' obligations, Empower would be committing theft. Of course, no one contends that is what's happening here—Empower had the right to collect repayment (via automatically debiting linked deposit accounts) precisely because Plaintiffs were obligated to repay their cash advances.

The possibility that a borrower could avoid repayment without being sued or sent to collections has no bearing on whether the borrower undertook an "obligation to repay" a Cash Advance. As Judge Corley aptly observed, "[t]hat some users avoid their obligation to repay Empower does not mean no obligation ever exists." *See* ER-11; *Feeman,* 2026 WL 880508, at \*8 ("Recourse against the individual is not an essential feature of debt.").

45

Empower also cites a few bankruptcy cases interpreting "right to payment" and "debt." AOB at 25, 28–29. For instance, Empower cites a Fifth Circuit case that quotes *Pennsylvania Department of Public Welfare v. Davenport*, 495 U.S. 552 (1990). There, the Supreme Court observed the Bankruptcy Code defines "debt" as "liability on a claim," which is defined in turn as "right to payment," which is defined in turn as "an enforceable obligation." *Id.* at 557–59; AOB at 25. Notably, the obligations in *Davenport* were found to be "debt" notwithstanding they were not enforceable "obligations in civil proceedings." 495 U.S. at 559. That being written, and setting aside that this case entails a different factual and statutory scheme, Plaintiffs' allegations and Empower's terms confirm Cash Advances are "obligations" which are "enforceable" through pre-authorized repayment debits and other means. Nothing in *Davenport* suggests that enforceable obligations are limited to those enforceable in court.

### iv.      Empower's other credit arguments miss the mark.

In addition to the arguments addressed above, Empower faults the district court for other aspects of its reasoning. For instance, Empower argues the "district court erred in focusing on the *procedure* for payment

46

of an advance rather than whether there is an *obligation* to repay an advance." AOB at 40–41. Not so—the district court explicitly found that Empower borrowers take on an obligation with each Cash Advance. *See* ER-10 ("[U]sers incur debt because, upon receiving a Cash Advance, 'a specific sum of money [becomes] due by agreement' with Empower[.]"), ER-11 ("That some users avoid their obligation to repay Empower does not mean no obligation ever exists.").

Moreover, Empower offers no explanation why its extension of a cash advance coupled with the borrower's promise to repay the advance on a date certain and agreement to a mandatory pre-authorized repayment procedure (that strictly follows Empower's terms of service) is insufficient to show an extension of credit. *See* AOB at 40–41. The FRB found this exact type of cash advance transaction and repayment "procedure" reflects "an agreement to defer payment of [a] debt." 65 Fed. Reg. at 17130. "On any ordinary understanding of the relevant terms, there is a 'debt' or 'obligation' where someone receives an advance in exchange for agreeing to authorize repayment on a future date." *Feeman*, 2026 WL 880508, at *12. In short, Empower's procedure for collecting

47

repayment is relevant to determining whether Cash Advances constitute credit, and the district court properly considered it.

Additionally, Empower chides the district court for considering this Court's determination in *Olson v. Unison Agreement Corp.*, No. 23-2835, 2025 WL 2254522 (9th Cir. Aug. 7, 2025), that the term "consumer credit obligation" does not require a legal collection remedy to be available. AOB at 45. Although *Olson* involved a different claim arising under Washington state law, *Olson* helpfully construed the "plain and ordinary meaning" of the term "credit obligation" through equally applicable dictionary definitions, construing the term as "an initial advance of funds or goods coupled with an obligation to make future payment to the person providing that advance." 2025 WL 2254522, at *3. That construction is relevant—and supports Plaintiffs.

\* \* \*

Empower's self-serving, atextual construction would create impossible line-drawing problems as to the degree of recourse necessary to support credit treatment. Would a financing product that permitted debt collection efforts short of litigation (*i.e.*, dunning letters, phone calls, emails, and texts) constitute credit? What about a financing product that

48

permitted credit reporting but not collection lawsuits? Under Empower's proposed framework, the answers to these questions and innumerable others are unclear because Empower's proposed exception is untethered to any text, precedent, or standard. This Court should decline Empower's invitation to carve out an indeterminate exception, divorced from text, to "credit" transactions that fit into "the kind of paper bag" Empower chose for Cash Advances. *See Pope*, 78 Ga. at 640.

### v.     The CFPB's new Advisory Opinion is irrelevant but, if anything, confirms Cash Advances are credit.

Empower also invokes the CFPB's recent nonbinding guidance, *Truth in Lending (Regulation Z); Nonapplication to Earned Wage Access Products*, 90 Fed. Reg. 60069 (Dec. 23, 2025) ("Advisory Opinion"), in support of its credit argument. AOB at 29–31. Empower's reliance is misplaced for at least three reasons.

**First**, the Advisory Opinion "has no legally binding effect" on its face and cannot supplant this Court's independent judgment. *See* 90 Fed. Reg. at 60076. As the Supreme Court explained, "[c]ourts interpret statutes, no matter the context, based on the traditional tools of statutory construction, not individual policy preferences." *Loper Bright*, 603 U.S. at 403. As shown above, application of "traditional tools of statutory

49

construction" compels the conclusion that Empower Cash Advances are credit. *Id.*

**Second**, the products addressed in the Advisory Opinion are dispositively different than Empower Cash Advance. The Advisory Opinion addressed "Covered EWA" products, for which providers give workers access to no more than the "accrued cash value of the[ir] wages" based on the provider's review of "payroll data." 90 Fed. Reg. at 60071. "Covered EWA" entails repayment through "a payroll process deduction in connection with the worker's next payroll event," and never from the "consumer's regular transaction accounts after the payment of wages into that account." *See id.*

Empower Cash Advance is plainly not a "Covered EWA" product. Empower does not provide advances based on the "accrued cash value" of earned wages or collect repayment through payroll deductions. There is no record support for the proposition that Cash Advances even provide access to "earned wages." Instead, Empower determines eligibility based on "the frequency or amount of [a borrower's] paycheck and [] spending habits," "payment history with Empower cash advances," "payments on [] debt obligations," and "transaction history on [] deposit accounts" as

50

gleaned through Empower's "review [of borrowers'] Primary Checking Account transactions." ER-28, 55–57.[14] And Empower's terms of service confirm that Cash Advance is simply "a service that provides a cash advance," not early access to already accrued wages discerned from payroll data. ER-28. Finally, repayment is not collected from a payroll deduction, but instead from the "consumer's regular transaction accounts after the payment of wages into that account." *See* 90 Fed. Reg. at 60071; ER-28, 45, 57–58.

**Third**, under the Advisory Opinion's logic, Cash Advance's structure demonstrates the advances *are* credit. The Advisory Opinion noted "the defining element of 'credit' is a consumer's repayment—at some point in the future—of the amount owed." 90 Fed. Reg. at 60072. This "defining element" is lacking for Covered EWA products because those borrowers "make[] no deferred payment" since wages accessed are repaid through payroll deductions and "never touch the consumer's regular transaction account." *Id.* By contrast, Empower Cash Advance

---

[14] *See also Feeman*, 2026 WL 880508, at *15 (finding materially identical non-recourse cash advance service was "only nominally an 'earned wage access' product" where it did not review payroll data, did not limit advances to "accrued wages determined from employer-provided payroll data," and engaged "in its own underwriting" process).

51

retains this "defining element of 'credit'": "a consumer's repayment—at some point in the future—of the amount owed." *See id.* Accordingly, the Advisory Opinion supports the conclusion that Empower Cash Advances are credit. *See Feeman*, 2026 WL 880508, at *15 ("Under the CFPB's own framework(s), a product with these characteristics [*i.e.*, a "non-recourse" payday advance repayable by "revocable," pre-authorized repayment debits] extends consumer credit.").

Empower mischaracterizes the Advisory Opinion's credit analysis. Empower erroneously suggests the Opinion's rationale is "equally applicable to the present context" in which Empower collects repayment "from the consumer's linked bank account." AOB at 30–31. But the language Empower quotes comes from a paragraph addressing how the "EWA market has evolved such that [employer-partnered EWA] providers now use a *variety of methods* for effecting transfers *through the payroll process*[.]" 90 Fed. Reg. at 60072 (emphases added). Between the various *payroll process deduction methods* used by employer-partnered providers, "there is no reason to preference one such method over others." *Id.* Contrary to Empower's suggestion, the use of a payroll process deduction to collect repayment was both a necessary element of the

52

Covered EWA definition and core to the CFPB's credit analysis (*i.e.*, it avoids the "defining element of 'credit'" for each transaction). Indeed, the Advisory Opinion says the exact opposite of what Empower suggests.

In sum, the Advisory Opinion's credit analysis lends no support to Empower's position. If anything, it supports Plaintiffs—Covered EWA products lack a defining element of credit that Empower Cash Advances possess: the consumer's promise to repay in the future.[15]

---

[15] Empower also relies on four irrelevant district court cases. *Odier v. Hoffmann Sch. of Martial Arts, Inc.*, 619 F. Supp. 2d 571 (N.D. Ind. 2008), involved contracts to purchase "martial arts instruction." *Id.* at 573. Notably, Empower uses *Odier* for its dicta regarding a "legally enforceable obligation" requirement that court believed was "likely" a requirement of "debt." *Foster v. EquityKey Real Estate Invs. L.P.*, No. 17-cv-00067-HRL, 2017 U.S. Dist. LEXIS 70958 (N.D. Cal. May 9, 2017), addressed an options contract, which is indisputably not an extension of credit and a far cry from Empower's cash advance product. *Id.* at *9, *14 (noting the FRB has explained "option contracts" are "not considered credit"). *Capela v. J.G. Wentworth*, No. CV09-882 (SJF) (WDW), 2009 WL 3128003 (E.D.N.Y. Sept. 24, 2009), addressed an assignment of rights in a structured settlement for cash, where the plaintiffs made no promise (recourse or otherwise) to repay. *Id.* at *1, *10. Last, the proposition from *CFPB v. Snap Fin. LLC*, No. 2:23-cv-00462, 2024 WL 3625007 (D. Utah Aug. 1, 2024), that "the formal terms of the agreement" control does not impair Plaintiffs' claims since Empower's terms confirm Plaintiffs' factual allegations that Cash Advance borrowers take on an obligation. *See supra.*

###### vi. Empower invokes irrelevant state laws.

Finally, Empower invokes state laws regulating so-called EWA services to further support its credit analysis. These state laws are beside the point for a host of reasons.

First, as Empower admits, "[t]he meaning of 'debt' under the MLA—and by extension TILA and Regulation Z—is a question of federal law," so state laws have no bearing on the analysis. *See* AOB at 36. Second, the MLA includes an express preemption clause categorically "preempt[ing] any State or Federal law, rule, or regulation" to the extent they are "inconsistent" with the MLA. 10 U.S.C. § 987(d)(1).[16] Third, that certain states have passed laws to designate "non-recourse" EWA products and fees *not* covered by existing credit laws suggests they currently *are* covered for bodies of law (*i.e.*, federal law) that have not expressly carved them out.

---

[16] It bears noting, since Empower doesn't, that one of the states Empower identifies with EWA-specific regulations does, in fact, treat products like Empower Advance as loans. *E.g.*, 10 Cal. Code Regs. § 1461(g) ("***Income-based advances*** under California Code of Regulations, title 10, section 1004, subdivision (g) ***are loans*** under subdivision (a) of this section." (emphases added)).

Long story short, every relevant tool of statutory construction supports the district court's conclusion that Empower Cash Advances are credit. Empower's clever attempts to put lipstick on a pig should be rejected.

### B. Plaintiffs' allegations and the undisputed material facts demonstrate that Empower's Instant Transfer Fees constitute "finance charges" under the MLA.

The district court correctly held that Empower's Instant Delivery Fee is a finance charge. The fees are "payable…by the consumer and imposed…by the creditor as an incident to or a condition of the extension of credit" for Cash Advances that include instant disbursement. 12 C.F.R. § 1026.4(a); *accord* 15 U.S.C. § 1605(a). Empower's arguments to the contrary rely on a stilted reading of the MLA and its implementing regulations and have been rejected by every court to consider them. As the district court correctly determined, the undisputed factual allegations, confirmed by Empower's terms of service, demonstrate Instant Delivery Fees constitute "finance charges," and, therefore, the MLA forecloses shunting that dispute into arbitration.

### i. Instant Delivery Fees are Incident to the Extension of Empower Cash Advances

As the Supreme Court explained, the term "incident to" in the finance charge definition "implies some *necessary* connection between the antecedent and its object," but "does not make clear whether a substantial (as opposed to remote) connection is required." *Pfennig*, 541 U.S. at 241 (emphasis in original).[17]

Empower's Instant Delivery Fees fall comfortably within the finance charge definition. No one pays an Instant Transfer Fee without taking a Cash Advance. "The fee exists only because the loan exists," and is thus "incident to" the extension of credit. *Feeman*, 2026 WL 880508, at *17. Every court to consider analogous fees in analogous contexts has reached the same conclusion. *See, e.g.*, *Orubo*, 780 F. Supp. 3d at 937–38; *Johnson*, 2025 WL 2299425, at *8–9 (similar); *Golubiewski*, 2025 WL 2484192, at *6; *Revell*, 808 F. Supp. 3d at 1051–52; *Russell*, 2025 WL 3691977, at *8; *Burrison*, 2026 WL 444638, at *7; *Lowe*, 2026 WL 654719, at *4; *Ramirez*, 2026 WL 828299, at *5–*8.

---

[17] When TILA was enacted, "incident" was defined as simply "anything which is usually connected with another, or connected for some purposes, though not inseparably." *Incident*, BLACK'S LAW DICTIONARY (4th ed. 1968).

That Empower offers advances that it disburses at a later date for no fee does not sever this connection. Consistent with the Supreme Court's explication that "incident to" implies only a "necessary connection" to the extension of consumer credit, the FRB promulgated a rule in 1996 explaining that "optional charges" may be considered part of the finance charge. Taking debt-cancellation agreements as an example, the FRB explained that "the voluntary nature of the arrangement does not alter the fact that debt cancellation coverage is a feature of the loan affecting the total price paid for the credit." *Truth in Lending*, 61 Fed. Reg. 49237, 49239 (Sept. 19, 1996). So, "even though a lender may not require a particular loan feature, the feature may become a term of the credit if it is included." *Id.* And "when it is included for an additional charge (either paid separately at closing or paid in the form of a higher interest rate or points), that amount represents part of the finance charge, even though less costly loans may be available without that feature." *Id.* Those principles apply with equal force to other "optional" fees charged for certain credit-related rights, such as "variable-rate loans [with] a[ paid] option to convert the loan to a fixed interest rate" and "premiums for voluntary credit insurance." *Id.*

57

Immediate delivery of cash is indisputably a feature that is "connected" to the Empower Advance credit product. If it were not, there would be no reason for Empower to tout the speed of its advances, and no one would pay to unlock the feature, when they would otherwise receive the payday advance one-to-two business days later.[18] But of course instant access to these loans is a feature of Empower Cash Advance. ER-11–14. Paying an Instant Delivery Fee "is the cost of obtaining credit on those terms." *Feeman*, 2026 WL 880508, at \*18.

The conclusion that optional fees have a necessary connection with Cash Advance transactions is bolstered by cases construing the term "incidental to" a debt in the context of the Fair Debt Collection Practices Act and analogous state laws. Courts interpreting these laws have held fees a borrower voluntarily pays for making loan payments online or over the phone are "incidental" to the debt, and thus prohibited, even though the fees are optional. *Alexander v. Carrington Mortg. Servs., LLC*, 23 F.4th 370, 377 n.2 (4th Cir. 2022) ("[W]e have a hard time seeing how the

---

[18] Without paying an Instant Delivery Fee, Empower's advances would be useless for the "Real-life moments when our customers used Cash Advance," including to cover the cost of a "Flat tire," "Grocery checkout," "Gas for the car," and "Vet bills." See ER-50 at n.24.

convenience fee is not incidental to the debt. Without the mortgage payment, there is of course no convenience fee."); *Glover v. Ocwen Loan Servicing, LLC*, 127 F.4th 1278, 1290 n.13 (11th Cir. 2025) (similar); *Lembeck v. Arvest Cent. Mortg. Co.,* 498 F. Supp. 3d 1134, 1136 (N.D. Cal. 2020) ("The only plausible reading of the word 'incidental' in this context is as a reference to something that is connected to but far less significant than the underlying debt. That describes the [Pay-to-Pay] fee well.").

### ii. Empower imposes fees to unlock the Instant feature of its Cash Advances.

Empower argues that the use of the word "imposed" in the regulation means that "only mandatory charges can qualify as finance charges." AOB at 48–49. That construction reads the regulation out of context. Finance charge means "the cost of consumer credit as a dollar amount" and "includes any charge *payable* directly or indirectly by the consumer and *imposed* directly or indirectly by the creditor as an incident to the extension of credit or a condition of the extension of consumer credit." 12 C.F.R. § 1026.4(a) (emphasis added). "Imposed" in this context "identifies the party conducting the charging," thus establishing a counterpoint: the fee is *payable* by the borrower and *imposed* (*i.e.,* charged) by the creditor. *Feeman*, 2026 WL 880508, at *16.

The term "imposed," however, does not establish "a standalone requirement that the charge be a sine qua non to access the credit." *Id.* Rather, when a creditor offers an optional loan feature for a fee, the creditor imposes that fee as an incident to that particular extension of credit. As the FRB explained, when a loan is structured with an optional feature, the fee for that feature "is one that has been imposed as an incident to that particular transaction." 61 Fed. Reg. 49237, 49239. While a creditor may impose some mandatory fees as a "condition of the extension of credit," meaning the creditor will not extend credit at all unless the borrower pays the fee, there are other mandatory fees a creditor imposes to unlock an optional loan feature that are "incident to . . . the extension of credit." This is the natural reading of the word in context. *See United States v. Olander*, 572 F.3d 764, 768 (9th Cir. 2009) (in interpreting statutes, courts must "consider the language itself, the specific context in which that language is used, and the broader context of the statute as a whole" (internal citation and quotation marks omitted)).

This reading, too, gives effect to the disjunctive in the definition of finance charge: "as an incident to **or** a condition of the extension of

60

credit." 12 C.F.R. § 1026.4(a) (emphasis added). Empower argues that "only mandatory charges can qualify as finance charges"—that is, charges imposed as a condition of the extension of credit. *See* AOB at 48. This reading renders the words "incident to" superfluous and ignores the disjunctive "or" used in the definition. Phrases separated by a disjunctive must "be treated separately." *See Azure v. Morton*, 514 F.2d 897, 900 (9th Cir. 1975).

Even accepting that "imposed" could act as a standalone limitation on the types of charges that can be finance charges, Instant Delivery Fees fit the bill. Whenever a borrower opts for the instant feature of Empower Advance, Empower "establishes," "applies," "levies," and "exacts" an Instant Delivery Fee "by [its] authority" as a creditor setting the terms for its product. *See* ER-28; *Impose*, BLACK'S LAW DICTIONARY (4th ed. 1968); *Impose*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/impose (last visited Apr. 1, 2026). That borrowers could take an advance with different material terms (in which funds are delivered one-to-two business days later) without a fee does not change the fact that Empower imposes Instant Delivery Fees to unlock the instant-access feature of Cash Advance. *Cf.*

61

*Revell*, 808 F. Supp. 3d at 1051 ("[E]xpedite fees impact the timing of funds, which is 'a material term of credit.'" (quoting *Orubo*, 498 F. Supp. 3d at 938)).

Several state statutes Empower cites use the word "imposed" as Plaintiffs do. These statutes require companies that meet the definition of "Earned Wage Access provider" to offer consumers an advance "at no cost[.]" *E.g.*, Ark. Code Ann. § 23-52-203(b)(4).[19] When the consumer elects the expedited feature, however, then he or she may have to pay "a charge *imposed by* a provider for delivery or expedited delivery of proceeds[.]" *Id.* at § 23-52-202(7)(A) (emphasis added).[20] This is consistent with Plaintiffs' reading of Regulation Z's definition in context—a fee is "imposed" when it is charged by the lender and payable by the borrower to access an optional feature of the product.

> iii. **Empower's citations to distinguishable and non-binding regulatory guidance and caselaw do not support its argument that Instant Delivery Fees are not finance charges.**

---

[19] *See also* Kan. Stat. Ann. § 9-2405; S.C. Code Ann. § 39-5-840; Utah Code Ann. § 13-78-101.

[20] *See also* Kan. Stat. Ann. § 9-2402; S.C. Code Ann. § 39-5-820; Utah Code Ann. § 13-78-101.

The CFPB's Advisory Opinion does not support Empower's argument. As a factual matter, the Advisory Opinion's assumption that "consumers can receive exactly the same service without paying the fee" is flatly contradicted by the allegations in this case. 90 Fed. Reg. at 60075. Plaintiffs allege Empower offers a payday advance that features "Instant Cash," which it delivers to borrowers "within minutes[.]" ER-47–48, ¶¶ 61, 64 (internal quotation marks omitted). Empower imposes an unavoidable fee for *that* feature. *Id.* Providing immediate disbursement of funds that must be repaid within fourteen calendar days is not "exactly the same service" as providing those funds two business days later. And there is a fee for obtaining more quickly the "actual use of borrowed capital within the loan's fixed repayment window." *Feeman*, 2026 WL 880508, at *17. So, even if the Advisory Opinion—which "has no legally binding effect, including on persons or entities outside the Federal government"—were entitled to any deference under *Loper Bright*, it does not address the facts Plaintiffs pleaded in their Complaint.

In arguing for a conclusion contrary to that of every jurist to have considered the statutory text in the context of similar allegations, Empower and the CFPB lean heavily on *Veale v. Citibank, F.S.B.*, 85 F.3d

63

577 (11th Cir. 1996). There, the Veales refinanced their home with a $361,800.00 loan from Citibank. *Id.* at 578. As part of the transaction, the Veales accepted Citibank's offer to mail payoff checks to their other mortgagees for a "$21.00 Federal Express charge." *Id.* at 578–79. The plaintiffs claimed the FedEx fee was a finance charge, but the Eleventh Circuit disagreed. *Id.*

Empower's heavy reliance on the 30-year-old *Veale* ruling is belied by the U.S. Supreme Court's subsequent ruling in *Pfennig*. In that case, the Supreme Court clarified that "incident to" requires only a "connection" to the extension of credit. 541 U.S. at 241; ER-7 ("[Veale] assumed 'incident to' requires the fee be a necessary condition of the extension of credit, but *Pfennig* [] rejected that assumption."). The *Veale* court's holding that a fee must be "required by" the lender to be considered "incident to the extension of credit" does not survive *Pfennig*.

That aside, *Veale* is distinguishable on the facts. The FedEx fee differs materially from Empower's Instant Delivery Fees. *First*, the FedEx fee in *Veale* was a pass-through fee for a third-party's services. The definition of finance charge excludes fees for third-party services, provided the lender neither requires the borrower to use the service nor

64

retains any portion of the fee. *See* 12 C.F.R. § 1026.4(a)(1)(ii) (finance charge would include "the portion retained" by the creditor). Here, by contrast, the Instant Delivery Fees Empower charges borrowers dwarf Empower's costs for the feature and are retained by Empower, rather than passed to a third party (unlike the *Veale* fee, which was passed through by Citibank to FedEx). ER-47, ¶ 59.

*Second*, in *Veale*, paying the FedEx fee did not unlock any loan feature. The disbursement date of the Citibank loan was set. The Veales would leave with $361,000 on the exact same terms whether they mailed the payoff checks to the other mortgagees themselves or, instead, reimbursed Citibank to do so for them. Paying this pass-through fee "did not affect the terms of the underlying refinancing transaction." AOB at 56; *Ramirez*, 2026 WL 828299, at *6 (noting that in *Veale* the "credit would have been extended to the plaintiffs on precisely the same terms regardless of their payment of the expedited shipping fee."). Thus, as the district court explained, the FedEx fee "did not relate to Citibank's own extension of credit but rather the plaintiffs' repayment to other creditors," whereas Empower's Instant Delivery Fee "is a condition of

65

Plaintiffs' receipt of instant credit from" Empower. ER-13; *accord Russell*, 2025 WL 3691977, at \*8; *Feeman*, 2026 WL 880508, at \*18.

Empower's arguments against the district court's reasoning imply that timing is not a feature of credit. That's nonsense. Home sales have closing dates. Car dealerships won't hold on to a vehicle indefinitely before moving on to the next buyer. *When* a borrower receives the use of borrowed money is important. Empower's advances are no different. Thus, Empower touts the instant nature of its short-term advances, advertises "real-life moments when [Empower's] customers used Cash Advance" at the point of sale, pre-selects the fee-carrying Instant-delivery option, and warns borrowers who opt out of that option that "It can take up to 2 business days for your funds to arrive . . . Consider selecting Instant or Empower delivery if you need your funds sooner." ER-12, 47–50. Empower is simply wrong that its borrowers "can obtain the identical cash advance . . . without paying the Instant Delivery Fee." AOB at 53. Indeed, if the instant option were exactly the same service as the non-instant option, why would Empower charge—and why would borrowers be willing to pay—a fee for one and not the other?

66

Empower caricatures the district court's analysis as, essentially, classifying Empower's Cash Advance with expedited delivery and without as separate credit products. AOB at 56. The district court did no such thing. Rather, Judge Corley applied the definition of "finance charge" to the facts of this case, correctly concluding that Empower touts the instant nature of its advances as a feature of the product and that it imposes a fee to unlock that feature. Courts throughout the country have rightly rejected identical arguments from this burgeoning industry of modern payday lenders.

## CONCLUSION

The district court correctly found the parties' dispute involves the extension of consumer credit. The district court, therefore, had no authority under the FAA to compel the dispute to arbitration. This Court, too, lacks appellate jurisdiction over this appeal. Plaintiffs respectfully request the Court dismiss this appeal for lack of jurisdiction or affirm and remand this action so it may proceed in the judicial forum Congress guaranteed Plaintiffs and other servicemembers for their disputes involving consumer credit.

67

Dated: April 1, 2026    Respectfully submitted,

*/s/Joshua R. Jacobson*
Joshua Jacobson
Jacob L. Phillips
JACOBSON PHILLIPS PLLC
2277 Lee Road, Suite B
Winter Park, Florida 32789
(321) 447-6461
joshua@jacobsonphillips.com
jacob@jacobsonphillips.com

Randall K. Pulliam
Lee Lowther
CARNEY BATES & PULLIAM, PLLC
One Allied Drive, Suite 1400
Little Rock, Arkansas 72202
(501) 312-8500
rpulliam@cbplaw.com
llowther@cbplaw.com

*Counsel for Plaintiff-Appellee*

68

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-6377

I am the attorney or self-represented party.

**This brief contains** 13,004 **words, including** 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated _____.

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Joshua R. Jacobson **Date** 4/1/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)**  |  25-6377

The undersigned attorney or self-represented party states the following:

○  I am unaware of any related cases currently pending in this court.

○  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

◉  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

> The following appeals may present issues similar to the issues presented in this case:
>
> Moss v. Cleo AI Inc., No. 25-5856
> Revell v. Grant Money, LLC, No. 25-7035
> Russell v. Dave, Inc., No. 26-12

**Signature**  |  s/Joshua R. Jacobson   **Date** 4/1/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

## CERTIFICATE OF SERVICE

I hereby certify that, on April 1, 2026, I caused the foregoing brief to be electronically filed with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit via the ACMS system and that service on all counsel of record will be accomplished by the ACMS system.

*/s/Joshua R. Jacobson*